IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SPPI-SOMERSVILLE, INC., *et al.*,<br><br>　　　　Plaintiffs,<br>　v.<br>TRC COMPANIES, INC., *et al.*,<br><br>　　　　Defendants.　　　　　　　　　／<br>AND RELATED CROSS- AND COUNTER-CLAIMS<br>　　　　　　　　　　　　　　　　　　／ | No. C 04-2648 SI<br>Consolidated with 07-5824 SI<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DOCKET NOS. 298 AND 314; DENYING DOCKET NO. 302; GRANTING DOCKET NO. 292; AND DENYING DOCKET NO. 327** |

On July 31, 2009, the Court heard argument on several motions for summary judgment. For the reasons set forth below, with respect to the motions raising a statute of limitations defense to plaintiffs' state law tort claims as they relate to solid waste contamination, the Court GRANTS in part and DENIES in part the motion filed by defendants TRC Companies Inc. and GBF Holdings LLC (and joined by CCWS), and DENIES the joinder/motion filed by Chevron. With respect to the cross-motions regarding the indemnity provision in the 1957 lease between the City of Antioch and Standard Oil, the Court GRANTS Antioch's motion and DENIES Chevron's motion.

**BACKGROUND**

This case is about four parcels of real property, totaling approximately 24 acres, located on both sides of Markley Creek in Antioch, California. The parcels are Assessor Parcel Numbers 076-010-030, 031, and 032, located north of Markley Creek and owned by plaintiff SPPI-Somersville, Inc. ("SPPI"), and Assessor Parcel Number 076-010-034, located south of Markley Creek and owned by plaintiff

1 Somersville-Gentry, Inc. ("SGI")[1]  Both SPPI and SGI are owned and/or controlled by the same
2 principal, Albert Seeno, Jr.

3 Plaintiffs filed this case on June 30, 2004. Plaintiffs claim property damage on the Subject
4 Property due to, *inter alia*, solid waste historically placed on and near the property. Plaintiffs purchased
5 the Subject Property on November 21, 2003 from the Tom Gentry California Company ("TGCC").
6 TGCC, in turn, had purchased the Subject Property in 1996 from Standard Oil Company of California,
7 predecessor in interest to defendant Chevron. Standard Oil leased Parcel 34 to defendant Antioch in
8 December 1957 for the disposal of waste by the sanitary landfill method; Antioch operated a landfill
9 on the parcel for one year under the lease. Plaintiffs allege that Standard Oil failed to disclose to TGCC
10 the presence of the landfill on Parcel 34.

11 Plaintiffs' master complaint alleges that "[a]t some point in July 2001, the Tom Gentry
12 California Corporation discovered that municipal solid waste had spilled from one or more of the
13 adjacent landfills[2] or otherwise been deposited onto the Property, contaminating at least the surface of
14 the parcel APN 076-010-034." Master Compl. ¶ 65. Plaintiffs also allege that municipal solid waste
15 deposited into and around Markley Creek in the vicinity of the Subject Property has contaminated the
16 property. *Id*. The complaint alleges a number of claims based on solid waste contamination on the
17 Subject Property, including private continuing nuisance (Claim No. 5), continuing trespass (Claim No.
18 6), negligence (Claim No. 7), negligence per se (Claim No. 8), ultrahazardous activity (Claim No. 9),
19 inverse condemnation (Claim No. 10), and state law declaratory relief (Claim No. 12).

20

21 **LEGAL STANDARD**

22 Summary adjudication is proper when "the pleadings, depositions, answers to interrogatories,
23 and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any

---

[1] The parties refer to the properties individually by their parcel numbers (e.g, "Parcel 34"), and collectively as the "Subject Property."

[2] The adjacent landfills are the Old Antioch Landfill operated by the City of Antioch, and the Contra Costa Sanitary Landfill (the "CCSL"). The CCSL is comprised of the former GBF Landfill, the former Pittsburg Landfill operated by the City of Pittsburg, and a solid waste landfill operated as the Contra Costa Sanitary Landfill. Master Compl. ¶ 1.

1  material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.
2  56(c).

3  In a motion for summary judgment, "[if] the moving party for summary judgment meets its
4  initial burden of identifying for the court those portions of the materials on file that it believes
5  demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so
6  that the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts
7  showing that there is a genuine issue for trial." *See T.W. Elec. Service, Inc., v. Pac. Elec. Contractors*
8  *Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). In
9  judging evidence at the summary judgment stage, the Court does not make credibility determinations
10 or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving
11 party. *See T.W. Electric*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*
12 *Corp.*, 475 U.S. 574 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991). The evidence
13 presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Conclusory, speculative testimony
14 in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary
15 judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

**I.    Statute of limitations on plaintiffs' state law tort claims for solid waste contamination**

**A.    TRC Companies, GBF Holdings LLC, and joinder by CCWS**

20 Defendants TRC Companies, Inc. and GBF Holdings, LLC have moved for summary judgment
21 on plaintiffs' state law tort claims for solid waste contamination. Defendants' motion does not address
22 these claims to the extent they seek relief for contaminated groundwater and vapor in the soil.
23 Defendants contend that these claims are barred by the three year statute of limitations because the
24 claims accrued no later than June 18, 2001 when the then-owner of the property, Tom Gentry, had actual
25 notice of probable solid waste contamination on Parcel 34.

26 The parties agree that the statute of limitations is three years for the claims at issue, and they also
27 agree that once the statute of limitations begins to run against one property owner, it runs against all
28 future property owners. *See CAMSI IV v. Hunter Technology Corp.*, 230 Cal. App. 3d 1525, 1534-35

3

1  (1991). The dispute centers on the interpretation of several pieces of evidence from June 2001 regarding a joint venture between TGCC and Sermar, LLC in an attempt to develop the Subject Property.[3] The first piece of evidence is a fax dated June 4, 2001 from Sermar to TGCC regarding environmental diligence that had been conducted on the Property by TGCC and Sermar's jointly-retained consultant. The first paragraph of the fax states: "Enclosed is a copy of the report we received from Environmental Service concerning the adjacent landfill and its affects [sic] on the property we seek to acquire." Broderick Decl. Ex. 16 (GEN000094).[4] The attached consultant's report includes the following section:

**Is There Any Evidence of Pollution Contributed by the Waste Disposed on the Property?**
There is no suggestion in the Listed Documents that the waste limits extend north of Markley Creek. Logs of soil boring logs for wells drilled on the Property noted general soil types and none of the soil types of conditions described in the logs could be considered as evidence of solid waste disposal on the Property. In contrast, for example, the log of soil boring for well MW-22,[5] located south of Markley Creek near the north edge of the landfill, noted fill and debris in the upper 5 feet.

Though the logs show no evidence of solid or liquid waste disposal or staining from liquid wastes, the logs themselves are not a sufficient basis to rule out the possibility of past disposal on the Property. Hypothetically, disposal of liquids, sludge, or solids could have occurred along Somersville Road or an unnamed dirt road that appears on the 1990 aerial base map used in the Amended Supplemental Remedial Investigation Report (see Figure S2-1).

---

[3] Defendants also contend that Tom Gentry had constructive knowledge of solid waste contamination prior to 2001 because (1) the history of the neighboring landfills was well-known; (2) an Environmental Impact Report from 1980 noted "large deposits of refuse" on the property; (3) the City of Antioch required a soils study identifying any possible site "contamination from the adjacent Garaventa dump site" as a condition of development; and (4) the Gentry Companies gave permission for CCSL's consultants to conduct environmental testing on the property in 1988, and the fact sheet accompanying the testing stated that its purpose was to "detect presence of organic compounds in soil and ground water." Plaintiffs contend that none of this evidence put Gentry on constructive notice, and they argue that at the most there are triable issues of fact as to whether Gentry reasonably should have known about the solid waste contamination prior to 2001. The Court agrees with plaintiffs that the pre-2001 evidence is susceptible to different interpretations, and thus DENIES defendants' motion on this ground.

[4] Plaintiffs object to Exhibits 16 and 24 to the Broderick Declaration on hearsay grounds. The Court OVERRULES these objections and finds that both documents are not offered for the truth of the matter asserted, but to show notice. *See Los Angeles News Service v. CBS Broadcasting, Inc.*, 305 F.3d 924, 935, *as amended by* 313 F.3d 1093 (9th Cir. 2002). In addition, these documents, as well as Exhibit 21 (cited *infra*), are business records. The Court also OVERRULES plaintiffs' authenticity objections to the deposition testimony submitted by defendants. This order does not rely on any of the other exhibits to which plaintiffs object, and thus the Court need not rule on plaintiffs' other objections.

[5] MW-22 is a groundwater monitoring well that was previously drilled on Parcel 34. Broderick Decl. ¶¶ 17, 18, Ex. 17, 18.

> My review of the Listed Documents found abundant chemical test laboratory results for ground water samples collected from wells installed on the Property, and also found creek sediment test results and soil gas test results. My review of the Listed Documents did not find chemical test laboratory results for soil samples collected on the Property.
>
> Review of aerial photographs, in conjunction with the logs of soil borings, could provide a sufficient basis for assessing whether there is likelihood of past use of the Property for disposal. To make this finding, aerial photographs should be viewed at 5 year intervals for the period 1940 to 1974. Apparently, based upon the available documents, the landfills were operated from 1946 to 1974, and later. After 1974, operation of the liquid hazardous waste ponds was terminated, but use of the landfills under the name "Contra Costa Sanitary Landfill" by Contra Costa Waste Service, Inc., for disposal of municipal non-hazardous waste, was continued until 1992. See Attachment A, Review of Aerial Photographs.

*Id*. at GEN000096.

The next piece of evidence is an email dated June 18, 2001 from Joe Fadrowsky, the current president of TGCC,[6] to Mark Vorsatz, regarding the TGCC-Sermar joint venture and the Subject Property. That email states,

> CONFIDENTIAL ATTORNEY CLIENT PRIVILEGED COMMUNICATION[7]
>
> Mark – You appear to understand the proposal correctly. One issue we expect Sermar to raise at some point is the valuation of the rear 4-acres that is somewhat land-locked by Markley's Creek. Sermar's environmental research appears to allude to the fact that some landfill may have occurred on this portion of the land. In addition, TRC called Dawn [Suyenaga][8] last week to inform us that when they made the first grading pass to level the staging area on this 4-acre parcel, they uncovered some land fill type material which they immediately covered up.[9] They will send us a map showing the area. In turn, we will be obligated to disclose this to Sermar. Even if Sermar suggests a lower value for this 4-acre site or even if it is excluded, this does not change our view of the

---

[6] Mr. Fadrowsky states that he has held the position of President of TGCC for approximately five years, and that from 1996 to the present he has been "responsible for acquisitions of new projects, major dispositions, major sales and/or leases, purchase and sale, development, entitlement transactions, and strategic planning." Fadrowsky Decl. ¶¶ 2, 3. It is unclear what Mr. Fadrowsky's title was at the time of the June 18, 2001 email, but that is irrelevant to these motions.

[7] Although at one point in this litigation TGCC asserted that the June 18, 2001 email was privileged, that claim was apparently abandoned during Mr. Fadrowsky's deposition when counsel for Chevron introduced the June 18, 2001 email without objection and questioned Mr. Fadrowsky about it.

[8] Dawn Suyenaga is the Vice President, Chief Operating Officer and General Counsel of TGCC.

[9] On June 4, 2001, TRC received permission from TGCC to grade or level the surface of Parcel 34; this work was in connection with work required under the settlement in *GBF/Pittsburg Landfill(s) Respondents' Group et al., v. Contra Costa Waste Service, et al.*, C 96-3147 SI. Broderick Decl. Ex. 21 (email from Dawn Suyenaga to Deems Padgett confirming that GBF Holdings could do leveling work on the parcel).

1         desirability of moving forward with Sermar on the other 20 acres.  Aloha,

2         Joe. F.

3 Broderick Decl. Ex. 24.

4         Defendants contend that the June 4, 2001 fax and the June 18, 2001 email demonstrate that TGCC had actual notice of solid waste contamination on Parcel 34, and thus that plaintiffs' state law tort claims based on solid waste contamination are untimely because they were filed over three years later on June 30, 2004.  The parties dispute whether the Court should apply federal or state law for determining the proper time for commencement of the statute of limitations.  "Under California law, a plaintiff discovers a claim when the plaintiff 'suspects or should suspect that her injury was caused by wrongdoing.'  By its terms, [CERCLA] sets a later date for commencement of the limitations period, tolling the start of the period for filing claims beyond the date that a plaintiff suspects the cause of injury until the time that he or she knows or reasonably should have known of that cause."  *O'Connor v. Boeing North American, Inc.*, 311 F.3d 1139, 1147-48 (9th Cir. 2002).  *O'Connor* holds that CERCLA's delayed discovery rule preempts California's discovery rule, and thus the Court agrees with plaintiffs that the federal standard applies here.  *Id.* at 1147.

        The Court finds that even under the more generous federal standard, the evidence shows that TGCC knew about the injury giving rise to the claims at issue because TGCC was notified twice in June 2001 by two third parties about solid waste on Parcel 34.  Plaintiffs assert that TGCC only had a "skeletal" understanding of the contamination in June 2001, and that the statute of limitations did not begin to run until December 2001 when a large section of the bank along Markley Creek collapsed and revealed the presence of extensive waste and garbage.[10]  Plaintiffs contend that the June 2001 documents did not put TGCC on notice of the full scope of the contamination, nor did TGCC know of the "cause" of the solid waste contamination.

        Plaintiffs' argument is not supported by the facts or the law.  Under CERCLA's delayed

---

[10] As defendants correctly note, plaintiffs' assertion of the December 2001 triggering event is at odds with their allegation in the master complaint that "[a]t some point in July 2001, the Tom Gentry California Corporation discovered that municipal waste had spilled from one or more of the adjacent landfills or otherwise been deposited onto the Property, contaminating at least the surface of the parcel APN 076-010-034."  Master Compl. ¶ 65.

6

discovery rule, the Court must engage in a two-part analysis to determine whether plaintiffs reasonably should have known of their claim.

> The goal of this analysis is to evaluate when a reasonable person would have connected his or her symptoms to their alleged cause. First, we consider whether a reasonable person in Plaintiffs' situation would have been expected to inquire about the cause of his or her injury. Second, if the plaintiff was on inquiry notice, we must next determine whether [an inquiry] would have disclosed the nature and cause of plaintiff's injury so as to put him on notice of his claim. The plaintiff will be charged with knowledge of facts that he would have discovered through inquiry.

*O'Connor*, 311 F.3d at 1150 (internal citations and quotations omitted). Here, a reasonable person in TGCC's position would have been expected to make a further investigation about the solid waste contamination after being notified twice in June 2001, by two different parties, that solid waste was present on Parcel 34. The Environmental Science report states that "the log of soil boring for well MW-22, located south of Markley Creek near the north edge of the landfill, noted fill and debris in the upper 5 feet." Broderick Decl. Ex. 16 at GEN000096. That same report described the steps that could be taken to investigate the issue further: "Review of aerial photographs, in conjunction with the logs of soil borings, could provide a sufficient basis for assessing whether there is a likelihood of past use of the Property for disposal." *Id*. A reasonable person in TGCC's position would have been expected to investigate the solid waste discovered on Parcel 34, and inquire whether the "cause" was one of the two adjacent landfills. Indeed, Mr. Fadrowsky's June 18, 2001 email shows that TGCC was aware that the solid waste on Parcel 34 was "land fill type material" and that "some landfill may have occurred on this portion of the land." Broderick Dec. Ex. 24.[11] *Cf. O'Connor*, 311 F.3d at 1151 (summary judgment improper where plaintiffs had cancer and "evidence was susceptible to more than one inference regarding whether Plaintiffs were aware of more than one potential cause of their illnesses. Factual disputes remain regarding whether Plaintiffs should have inquired about whether the contamination from the Rocketdyne facilities, rather than any other source, was connected to their illnesses."); *Dubose v.*

---

[11] Mr. Fadrowsky's declaration in opposition to defendants' motion for summary judgment states, "Prior to 2001, to the best of my knowledge and belief, I had no knowledge of landfilled waste or debris in Markley Creek or on Parcel 034." Fadrowsky Decl. ¶ 8. Mr. Fadrowsky's declaration does not discuss the Environmental Science report or attempt to explain the contrary statements in his June 18, 2001 email. Plaintiffs cannot create a genuine issue of fact by submitting this declaration testimony that is squarely at odds with Mr. Fadrowsky's own pre-litigation statements showing that TGCC in fact had notice in June 2001 that solid waste was present on Parcel 34.

7

*Kansas City Southern Ry.*, 729 F.2d 1026, 1031 (5th Cir. 1984) ("When a plaintiff may be charged with awareness that his injury is connected to some cause should depend on factors including how many possible causes exist[.]"). The Court finds that plaintiffs' state law tort claims based on solid waste contamination on Parcel 34 are time-barred, and thus GRANTS defendants' motion in this regard.[12]

However, the Court finds that because the record is more equivocal with regard to notice to TGCC of solid waste on the 20 acres north of Markley Creek, summary judgment is not appropriate on plaintiffs' claims regarding the rest of the Subject Property. Defendants argue that once contamination was discovered on Parcel 34, a reasonable property owner would investigate the remainder of the property. Plaintiffs emphasize the language in the Environmental Science report stating that there was no evidence of solid waste disposal on the 20 acres north of Markley Creek. Broderick Decl. Ex. 16 ("Logs of soil boring logs for wells drilled on the property noted general soil types and none of the soil types or conditions described in the logs could be considered as evidence of solid waste disposal on the Property."). Defendants rely on *CAMSI IV v. Hunter Technology Corporation*, 230 Cal. App. 3d 1525 (1991), in which the court rejected the claim that discovery of contamination on a "new and different area of the Subject Property" affected the statute of limitations. "Given notice of the presence of [contamination] anywhere on the property, the owner could properly be expected, in the exercise of reasonable diligence, to conduct an adequate investigation of all parts of its property and particularly of former manufacturing sites." *Id*. at 1537-38. However, *CAMSI IV* is distinguishable because here the environmental report providing the notice of injury expressly stated that no solid waste was found on the 20 acres north of Markley Creek.[13] Because there is a triable issue of fact on this question, the Court DENIES defendants' motion with respect to the other parcels in the Subject Property.

---

[12] Plaintiffs assert that even if their claims are untimely, to the extent that the twelfth claim for declaratory relief arises from their claims for continuing private nuisance and continuing trespass (neither of which are untimely), the twelfth claim should survive. Defendants do not respond to this contention. The Court agrees with plaintiffs that the twelfth claim for relief, insofar as it is derivative of the continuing private nuisance and continuing trespass claims, survives summary judgment.

[13] Of course, as defendants note, the same report stated that "the logs themselves are not a sufficient basis to rule out the possibility of past disposal on the Property."

8

### B. Chevron

Defendant and third party claimant Chevron U.S.A. Inc. ("Chevron") joined in defendants' motion, and contends that for the same reasons discussed above, plaintiffs' state law claims for solid waste contamination are untimely. Plaintiffs contend that even if their claims are untimely as against the other defendants, plaintiffs' claims against Chevron are not barred, because there is a tolling agreement which expressly precludes Chevron from raising a statute of limitations defense. The tolling agreement was entered into between TGCC and Chevron, and was signed by Mr. Fadrowsky on behalf of Gentry on November 20, 2003, and by Chevron's representative on June 29, 2004. Fadrowsky Decl. Ex. 3. Under the tolling agreement, TGCC and Chevron agreed to "toll any applicable statute of limitations period or laches defense from the date of discovery of the Debris/Contamination until November 15, 2007, (hereinafter "Tolling Period")," and agreed "not to assert the defense of laches, statute of limitations or any other defense based upon the failure to file timely an action during the Tolling Period of this Agreement with regard to the alleged Debris/Contamination at the Property." Fadrowsky Decl. Ex. 3 ¶¶ 2, 3.

Chevron contends that the tolling agreement does not toll the statute on plaintiffs' claims because as of June 29, 2004, when the agreement was executed, (1) TGCC no longer possessed those claims, having previously assigned them to SPPI when SPPI purchased the Subject Property from TGCC, and (2) plaintiffs' state law claims had already expired. The Court is not persuaded by Chevron's arguments. The Tolling Agreement expressly permits Gentry to assign the tolling agreement: "This Agreement may be assigned by Gentry to an entity that purchases the Property, in which event Gentry shall provide Chevron with the notice of the person or entity to which Notice must be sent pursuant to Paragraph 6, above," *Id*. ¶ 7, and the assignment was made after Gentry signed the tolling agreement. Further, the Court is persuaded that because claims run with the land, defenses to those same claims – such as a statute of limitations defense – also run with the land. *Cf. CAMSI IV*, 230 Cal. App. 3d at 1535.

The Court is also not persuaded by Chevron's argument that the tolling agreement is irrelevant because the statute of limitations had already expired by the time the tolling agreement was executed. This argument ignores the language of the tolling agreement, which provides in relevant part,

9

> The parties agree to toll any applicable statute of limitations period or laches defense *from the date of discovery of the Debris/Contamination* until November 15, 2007, (hereinafter the "Tolling Period"), which date the parties agree is within the four years of the date of expiration of the time limited for the commencement of any action tolled hereby.

*Id.* ¶ 2 (emphasis added). Here, the "date of discovery of the Debris/Contamination" was June 18, 2001 at the latest (and arguably earlier), and thus under the terms of the tolling agreement, the statute of limitations was tolled beginning on that date until November 15, 2007. Thus, under the tolling agreement, plaintiffs' claims filed on June 30, 2004 were not time-barred.

Chevron cites several cases for the general proposition that "[t]olling can only suspend the running of a statute that still has time to run; it cannot revive a statute which has already run out." *Forman v. Chicago Title Ins. Co.*, 32 Cal. App. 4th 998, 1005 (1995). However, none of these cases address a situation where the parties entered a tolling agreement that, by its terms, tolls the statute of limitations beginning on the date that the statute would normally start to run, here the "date of discovery of the Debris/Contamination." Chevron also cites cases where courts held that tolling agreements made after the statute of limitations had run did not toll the statutes. However, those cases are distinguishable because they involve tolling agreements that tolled claims on dates certain which post-dated the expiration of the statute of limitations. For example, in *Bachman v. Bear Stearns & Company*, 57 F. Supp. 2d 556, 561 (N.D. Ill. 1999), the claims expired on January 28, 1994, and the tolling agreement was made on November 29 1995, and tolled all claims beginning November 29, 1995. Similarly, in *Porwick v. Fortis Benefits Insurance Company*, the court found a 1997 tolling agreement did not toll claims that had expired in 1993:

> The parties entered into a written tolling agreement which, according to plaintiff, tolled all statutes of limitations from August 26, 1997 through July 2, 1997. (Pl.'s Mem. Opp'n Mot. to Dismiss at 18 n. 18). This agreement was executed four years after the applicable statutes of limitations had expired, and hence the agreement is of no consequence. In fact, the tolling agreement itself specifically provides that "[c]laims, if any, that would be barred under applicable statutes of limitations as of August 25, 1997 are not intended to be revived by this Tolling Agreement." (Am. Compl. Ex. D ¶ 2).

No. 99 CV 10122, 2004 WL 2793186, at *7 n.4 (S.D.N.Y. Dec. 6, 2004).[14]

---

[14] Chevron also cites *Pacific Harbor Capital, Inc. v. Barnett Bank, N.A.*, 252 F.3d 1246, 1251 (11th Cir. 2001), in which the Eleventh Circuit affirmed a summary judgment based on the statute of limitations and held that the parties' tolling agreement was "irrelevant because the statute would have

10

Here, instead of tolling all claims from the date the tolling agreement was executed (June 29, 2004), the tolling agreement tolls all claims "from the date of discovery of the Debris/Contamination," through November 15, 2007. Chevron does not address this language in the tolling agreement, and instead asserts that "there is nothing in the tolling agreement indicating the parties intended to revive any claims whose limitations period had lapsed." Chevron's reply at 4 n.3. Chevron argues that the tolling agreement's language that "Chevron and Gentry wish at this time to avoid litigation and preserve their respective rights and claims concerning Gentry's claim for damages . . . ." indicates that the parties did not intend to revive expired claims. The Court finds no such intent in the language of the tolling agreement; unlike the agreement in *Porwick*, here the parties did not explicitly state their intent not to revive expired claims. To the contrary, the parties' agreement to toll all claims "from the date of discovery" – as opposed to a specific date – indicates that the parties intended to do simply that: "toll all applicable statutes of limitations period or laches defense from the date of discovery of the Debris/Contamination until November 15, 2007."

Accordingly, the Court DENIES Chevron's motion for summary judgment.

## II.     Indemnification under 1957 City of Antioch/Standard Oil Lease

In December 1957, the City of Antioch and Standard Oil entered into a year-long lease which authorized Antioch to use Parcel 34 for the disposal of garbage and refuse. *See* Decl. of Matthew G. Dudley ("Dudley Decl."), Docket No. 293, Ex. A. The lease states,

> Said land shall be used exclusively for the disposal of garbage and refuse, it being understood, however, that there shall be no burning on said land, but that disposal shall be conducted by the sanitary land filling method which consists of compaction and daily sealing of the cell by depositing approximately six inches of earth on the top and the open end of said cell; provided, however, that such filling, including the earth covering, shall not exceed two feet above ground level existing as of the date hereof.

*Id.* ¶ 2. In addition to placing certain conditions on Antioch's disposal of garbage and refuse, the lease contained the following indemnity provision:

> Lessee agrees to hold Lessor and its present and future subsidiaries harmless from and to indemnify them against any and all damage to or loss of any buildings, structures or

---

run by the time it was made." There is no information in *Pacific Harbor* about the beginning date of the tolling agreement, and thus that case does not assist Chevron.

11

> other property, or injury to or death of person, that directly or indirectly may be caused by or arise or result from Lessee's occupancy or use of said premises, or the enjoyment of any of the rights herein, or the breach by Lessee of any of Lessee's obligations hereunder, irrespective of any negligence of Lessor. Lessee also agrees to hold Lessor and its present and future subsidiaries harmless from and to indemnify them against any claim for damage to or loss of any buildings, structures, improvements or other property of Lessee in, on, and about said premises, or injury to or death of any person on said premises on behalf of or at the invitation of Lessee, whether such claim arises out of the negligence of Lessor or its present or future subsidiaries, or otherwise.

*Id.* ¶ 10. Chevron filed a third-party complaint against Antioch after Antioch refused to indemnify Chevron for plaintiffs' claims. Both Chevron and Antioch have moved for summary judgment on the indemnity issue.

The parties agree that California law applies to the interpretation of the lease. "The interpretation of a written instrument . . . is essentially a judicial function to be exercised according to the generally accepted canons of interpretation so that the purposes of the instrument may be given effect." *Parsons v. Bristol Development Co.*, 62 Cal.2d 861, 865 (1965). The California Civil Code sets forth numerous guidelines under which a contract must be interpreted. "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Cal. Civ. Code § 1636. When interpreting a contract, California courts begin their analysis with the language itself. "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." *Id.* at § 1638. "[T]he intention of the parties is to be ascertained from the writing alone, if possible . . . ." *Id.* at §1639. "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." *Id.* at §1641.

Antioch contends that "or other property" in the phrase "buildings, structures or other property" does not include the land itself, and instead should be interpreted to mean property similar to "buildings" and "structures." Antioch argues that throughout the lease and in the indemnity provision in particular, the lease distinguishes between "buildings, structures or other property," on the one hand, and "said land," "said premises," and "demised premises" on the other. For example, the lease states that "[s]aid land shall be used for the disposal of garbage and refuse," "Lessee, at Lessee's own cost and expense, shall at all times keep the demised premises and any buildings or structures placed thereon in good order and repair," "Lessee covenants and agrees to fully pay for all materials joined or affixed to the demised

premises, for all labor performed thereon, and all charges against any buildings, structures or other property or improvements upon said land . . . ." Antioch argues that because the lease uses the language "buildings, structures or other property or improvements *upon said land*," and uses the terms "said land" and "said premises" interchangeably, "other property" in this context does not include the land. Antioch also argues that because the lease declares that the land would be used for the disposal of waste, the presence of the landfilled waste was anticipated and intended by both parties to the agreement and therefore could not have been intended by the parties to constitute "damage to or loss of any buildings, structures or other property."

In addition, the lease contains a maintenance obligation, which states:

> Lessee, at Lessee's own cost and expense, shall at all times keep the *demised premises and any buildings or structures placed thereon* in good order and repair, in a neat, safe, sanitary condition, free from waste and damage.

Dudley Decl., Ex. A at ¶ 8 (emphasis added). In light of the fact that "demised premises" is followed by the conjunctive "and," which precedes "any buildings and structures placed thereon," the clause distinguishes between land on the one hand and buildings and structures on the other. *See Pico Citizens Bank v. Tafco, Inc.,* 165 Cal. App. 2d 739 (1958) (every provision of a contract must be construed so to give force and effect not only to every clause but to every word in it, so that no clause or word may become redundant). Similarly, the subsequent paragraph of the lease draws a distinction between "said land" and "any buildings, structures, or other property":

> Lessee covenants and agrees to fully pay for all materials joined or affixed to the demised premises, for all labor performed thereon, and all charges against *any buildings, structures or other property or improvements upon said land*, at Lessee's instance or request, and not to permit or suffer any lien of any kind or nature to be imposed or enforced against said premises for any work done or material furnished thereon.

*Id.* at ¶ 9 (emphasis added). Here, the lease distinguishes between "demised premises" and "said land," and things or other property "joined or affixed" or "upon" the demised premises or said land. Considering the recurring and relatively uniform use of the terms within the phrase "buildings, structures or other property" throughout the lease to refer to things other than the subject land, the parties intended to apply a similar distinction when using these terms in the indemnity provision. *See People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*, 107 Cal. App. 4th 516, 526 (2004) (in the absence of something suggesting otherwise, identical terms in a contract should be given the same meaning

13

throughout). Because the lease can be interpreted from within the four corners of the lease, there is no need to consult extrinsic sources such as dictionaries. *See AIU Ins. Co.*, 51 Cal.3d 807 (the mutual intent of the parties "is to be inferred, if possible, solely from the written provisions of the contract"); Cal. Civ. Code § 1639.

Chevron contends that the phrase "or other property" in the indemnification clause should be interpreted broadly to cover damage to *all* forms of property, including the land itself. Chevron argues that the lease does not specifically define "property" or "other property" or give either term any special or limited meaning within the lease, and Chevron cites several dictionary definitions of "property" which include both personal property and real property. Chevron also relies on *Jones-Hamilton Co. v. Beazer Materials & Services, Inc.*,973 F.2d 688 (9th Cir. 1992), in which the Ninth Circuit broadly interpreted following indemnity provision:

> [Jones-Hamilton ("J-H")] agrees to comply with all applicable Federal, State and Local laws, ordinances, codes, rules and regulations and to indemnify WTCC against all losses, damages and costs resulting from any failure of J-H or any of its employees, agents or contractors to do so.

*Id*. at 691. In *Jones-Hamiltion*, J-H had argued that the phrase "all applicable Federal, State and Local laws, ordinances, codes, rules and regulations" should be limited to "workman's compensation laws, overtime laws, labor laws, and industrial health and safety laws." *Id*. The Ninth Circuit rejected this argument, stating that "had the parties chosen to limit the scope of the indemnification clause in the manner J-H suggests, they would surely have made this clear in the Agreement." *Id.* (citing *Blumenfeld v. R.H. Macy & Co.*, 92 Cal. App. 3d 38, 45 (1979) (refusing to admit extrinsic evidence suggesting on particular cause of action was not assigned, where agreement explicitly assigned "all claims against third parties")).

*Jones-Hamilton* is distinguishable, however, because there was nothing in the language of the *Jones-Hamilton* indemnity clause suggesting that the parties intended to limit or narrow the "applicable Federal, State, and local laws, ordinances, codes, rules and regulations," and to the contrary, the parties' use of "all" showed that the parties intended a broad construction. Here, the indemnity clause (and the entire lease) draws a distinction between "buildings, structures, or other property" and "said premises," indicating that the parties considered "or other property" to be different from "said premises."

14

Chevron also argues that the indemnity provision is similar to the clause at issue in *Ryan Mercantile Co. v. Great Northern Railway Company*, 294 F.2d 629 (9th Cir. 1961). In that case, the indemnity provision stated:

> Ryan shall indemnify and save Great Northern harmless from any and all personal injuries, damages, claims, suits, costs and recoveries of every name and nature which may in any manner arise or grow out of the business conducted by Ryan on the leased premises, or the use or occupancy thereof by Ryan, or by other persons at Ryan's instance or with Ryan's consent or knowledge during the term of this lease, whether due to the negligence of Great Northern, its contractors, officers, agents, and employees. . . .

*Id.* at 631. The court found the indemnity provision applied to his use of the railroad right of way on which a car accident occurred because it grew "'out of business conducted by Ryan on the leased premises' and 'out of the use and occupancy thereof by Ryan.'" *Id.* at 633. The Court finds Chevron's reliance on *Ryan Mercantile* unpersuasive. As with *Jones-Hamilton*, the language in the *Ryan Mercantile* indemnity provision is significantly broader ("*any and all* personal injuries, damages, claims, suits, costs and recoveries of *every name and nature* which may in *any manner* arise or grow out of the business conducted by Ryan on the leased premises, *or* the use *or* occupancy thereof by Ryan . . .") than the language found in the present lease, which applies to damage *arising from* occupancy or use of the land, not damage to the land itself.

The parties devote much of the briefing to discussing the differences between "personal property" and "real property," despite the fact that the lease does not use these terms. Even if the Court interprets "property" to include real property for the purpose of the lease, the indemnity provision still draws a meaningful distinction between "buildings, structures or other property" on the one hand and "said premises" on the other. Therefore, adopting Chevron's interpretation of "property" to include both real and personal property does not address the further distinction between "buildings, structures or other property" and "said premises" or "said land" that appears throughout the lease. *See IBEW-NECA Pension Trust Fund v. Flores*, 519 F.3d 1045, 1047 (9th Cir. 2008) ("We interpret written terms in the context of the entire agreement's language, structure, and stated purpose.").

After review of the lease as a whole and the specific language of the indemnity provision, the Court concludes that "or other property" in the indemnity clause does not cover damage to the land. The Court is persuaded that because the lease repeatedly uses the terms "buildings" and "structures" in

15

particular instances and "premises" and "land" in others, and because the lease's explicitly stated purpose was that the land be used for landfilled waste, the parties did not intend for Antioch to indemnify Standard Oil against damages to the subject land as alleged in the complaint.

## CONCLUSION

For the reasons stated above, the Court GRANTS IN PART and DENIES IN PART the motion for summary judgment filed by defendants TRC Companies and GBF Holdings LLC, as well as the joinder filed by CCWS. (Docket Nos. 298 and 314). The Court DENIES Chevron's motion for summary judgment. (Docket No. 302). The Court GRANTS Antioch's motion for partial summary judgment (Docket No. 292) and DENIES Chevron's motion for partial summary judgment. (Docket No. 327).

**IT IS SO ORDERED.**

Dated: August 3, 2009

SUSAN ILLSTON
United States District Judge